IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|   |   |
|---|---|
| TRANSPACIFIC TIRE & WHEEL, INC. | : |
| v. | :   Civil Action No. DKC 2006-0187 |
| ORTECK INTERNATIONAL, INC., | : |

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this commercial contract case is the motion by Plaintiff TransPacific Tire & Wheel, Inc. for summary judgment on counts 1, 2, and 11 of its amended complaint. (Paper 62). The issues have been briefed fully and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, Plaintiff's motion will be granted.

**I.  Background**

The following facts are either undisputed or viewed in the light most favorable to the non-moving party, Orteck International, Inc. In December 2002, Plaintiff TransPacific Tire & Wheel, Inc. ("TransPacific") was established as a corporation under California law. TransPacific was created to purchase certain brands of tires from China and distribute them in North America. Defendant Orteck International, Inc. ("Orteck") is a tire distributor that is incorporated and has

its sole place of business in Maryland.[1]  The court has subject matter jurisdiction because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest, legal fees, and costs.  28 U.S.C. §§ 1332 and 1334(b).

Orteck was one of TransPacific's customers from about February 2003 to March 2005.  As a customer, Orteck bought tires from TransPacific and sold them to a number of downstream tire distributors.  (*Orteck*, Paper 58 ¶ 1; *Orteck*, Paper 112, Attach. 7, Chan Dep., at 77:17-18).

In 2003, TransPacific and Orteck entered into an arrangement under which Orteck was to send purchase orders to TransPacific for the particular quantity and type of tires it sought to purchase.  TransPacific calls this agreement the "Factory Direct Agreement."  (*Orteck*, Paper 112, Attach. 3, ¶

---

[1] On October 21, 2005, Orteck and another company, Venetian Investments, LLC, filed a separate case against TransPacific in the United States District Court for the District of Maryland. That case is *Orteck Int'l, Inc. et al. v. TransPacific Tire & Wheel, Inc., et al.*, No. 05-2882 (D.Md. filed Oct. 21, 2005) ("*Orteck*").  The cases have not been consolidated but have proceeded on parallel tracks for discovery and scheduling purposes.  Here, TransPacific refers to the same "Defendants' Statement of Undisputed Material Facts" ("DSUMF") it filed in *Orteck*.  (*Orteck*, Paper 112, Attach. 3).  Likewise, Orteck refers to the same "Plaintiffs' Statement of Material Facts" ("PSMF") it filed in *Orteck*, although it also filed that document in this case.  (Paper 67, Attach. 3).  In DSUMF and PSMF, the term "Defendants" includes TransPacific and the term "Plaintiffs" includes Orteck.

114).    Under  the  Factory  Direct  Agreement,  TransPacific  was
supposed  to  deliver  the  tires  Orteck  ordered  with  an  invoice
that  indicated  the  amount  due  to  TransPacific  for  the  tires.
(*Orteck*,  Paper  112,  Attach.  21,  DeIorio  Decl.,  ¶  9).
Subsequently,  Orteck  was  obligated  to  remit  payment  for  the
tires  to  TransPacific.   Orteck  began  to  purchase  tires  from
TransPacific  in  2003  on  a  purchase  order  basis.   (*Id.* at 10).
TransPacific  fulfilled  the  orders,  arranged  for  delivery  of  the
tires,  and  issued  invoices  to  Orteck.   (*Id.* at 11, 21; *Orteck*,
Paper  112,  Attach.  7,  Chan  Dep.,  at  179:16-180:9;  Attach.  14,
DeIorio  Dep.,  at  156:1-157:1).

During  2003  and  part  of  2004,  Orteck  issued  purchase  orders
for  tires  to  TransPacific's  customer  service  department  in
California.   TransPacific  calls  this  arrangement  the  "California
Warehouse  Agreement."   (Paper  68,  at  3).   Under  the  California
Warehouse  Agreement,  TransPacific  was  supposed  to  deliver  the
tires  Orteck  ordered  from  its  California  warehouse  and  send
Orteck  an  invoice  indicating  the  amount  due  to  TransPacific  for
the  tires.   (*Id.*).   Throughout  2004,  Orteck  submitted  purchase
orders  to  TransPacific  for  tires  from  TransPacific's  California
warehouse.   TransPacific  then  delivered  the  tires  from  its
Carson,  California  warehouse  to  locations  designated  by  Orteck

along with an invoice indicating the amount due.   (Paper 68, at 3; Paper 112, Attach. 21, DeIorio Decl. ¶ 13).

In early 2004, Sonny Veen ("Veen"), Orteck's executive vice president of purchasing, attended a meeting at TransPacific's headquarters in California. (*Orteck*, Paper 112, Attach. 5, Veen Dep., at 290:3-6).   TransPacific's representatives Brian Chan ("Chan") and Vic DeIorio ("DeIorio") were also present at the meeting. (*Orteck*, Paper 112, Attach. 7, Chan Dep., at 276:2-20; Attach. 14, DeIorio Dep., at 153:11-21).   At the meeting, Veen, Chan, and DeIorio discussed a possible arrangement whereby each company would pay half of the expenses for a warehouse in Maryland (the "Maryland Warehouse") where TransPacific and Orteck could both store tires. There was never a written agreement regarding the Maryland Warehouse. (*Orteck*, Paper 112, Attach. 5, Veen Dep., at 301:16-19, 337:13-20).

TransPacific alleges that although the parties did not reach an agreement on the Maryland Warehouse itself, they agreed that TransPacific could ship tires it owned to the warehouse and Orteck could sell TransPacific's tires on a consignment basis and thereafter pay TransPacific for the tires. (*Orteck*, Paper 112, Attach. 9, Chan Decl., ¶ 41; Attach. 14, DeIorio Dep., at 226:12-227:3; Attach 21, DeIorio Decl., ¶ 45).   TransPacific calls this agreement the "Consignment Agreement."   Bruce

4

Campbell ("Campbell"), who also attended the meeting in California, testified that it was agreed that Orteck could sell tires that TransPacific stored in the warehouse and Orteck would have to pay for them once they were sold. (*Orteck*, Paper 112, Attach. 17, Campbell Dep., at 178:15-22). Campbell was a former Orteck consultant and later a TransPacific employee.[2] Additionally, Campbell and Veen both testified that there was no agreement that TransPacific would be limited as to what tires it could store in the warehouse. (*Id.* at 177:3-178:14; *Orteck*, Paper 112, Attach. 5, Veen Dep., at 302:11-13).

Veen testified that the terms concerning the Consignment Agreement "were never finalized. All was [sic] finalized was Orteck would order the tires. [TransPacific] would ship the tires as per the order. We would sell the tires and grow the business." (*Orteck*, Paper 112, Attach. 5, Veen Dep., at 301:20-302:6).

On February 13, 2004, Veen wrote to Chan to propose using a warehouse located at 12201 Old Columbia Pike, Silver Spring, Maryland 20904. Veen and Chan exchanged emails over the following days regarding the warehouse rent and other costs. Chan wrote to Veen regarding potential risks to TransPacific,

---

[2] Orteck deposed Campbell on September 22, 2008. (*Orteck*, Paper 112, Attach. 17, Campbell Dep.).

and Veen replied in an email on February 17th, which stated, in relevant part:

> Every business venture has risks.
>
> Orteck has to invest 150,000 in warehouse racking and equipment, have overall payroll of $250,00 [sic] per year.  Just in the first year we have to spend $500,000. Orteck will make profit to cover the expenses, but the long term benefit goes to [TransPacific] as Primewell is your brand. If you were making Orteck brand then the deal would be different.
>
> [TransPacific] has NO RISK.  Even if the tires are not sold they are still your asset and fully insured, what is your risk??

(*Orteck*, Paper 112, Attach. 26, at 1-2).  Orteck negotiated and signed the lease for the Maryland Warehouse.  (*Orteck*, Paper 112, Attach. 27, Maryland Warehouse Lease; Attach 5, Veen Dep., at 321:2-21).

After the meeting in California, TransPacific began to ship tires to the Maryland Warehouse.  (*Orteck*, Paper 112, Attach. 21, Ex. CC).  Orteck asserts that TransPacific sent "surplus and unwanted" tires to the Maryland Warehouse.  (*Orteck*, Paper 112, Attach. 5, Veen Dep., at 327:16-328:2).  Orteck admitted through Veen's testimony, however, that these tires were "surplus and unwanted" only because Veen had not ordered them.  (*Id.* at 329:5-330:3).  Veen also admitted that the parties did not have a finalized agreement, written or otherwise, that prohibited

TransPacific from shipping tires to the warehouse if Orteck had not ordered them. (*Id.* at 331:9-332:13). TransPacific periodically audited the Maryland Warehouse to determine the amount of consignment sales that had taken place. (*Orteck*, Paper 112, Attach. 17, Campbell Dep., at 180:21-181:4, 20-24).

In October and November of 2004, Orteck sold the "surplus and unwanted" tires at "fire sale" prices. (*Orteck*, Paper 112, Attach. 5, Veen Dep., at 356:14-358:6, 538:14-20; Attach. 14, DeIorio Dep., at 214:5-215:13). Veen stated that "fire sale" meant a "deep discount". (*Orteck*, Paper 112, Attach. 5, Veen Dep., at 582:9). Veen testified that he could not remember how much Orteck realized from the sales of TransPacific's tires at the "fire sale" prices. (*Id.* at 538:21-539:2). Veen also testified that Orteck had not come to an internal estimate of the value of the tires. (*Id.* at 598:7-601:12). Veen's declaration, filed after Veen's deposition was taken, states that the total amount that Orteck realized from the fire sale of TransPacific tires was $547,089. (Paper 67, Attach 15, Veen Decl., ¶ 41). TransPacific alleges that it was never paid for the tires that were sold in the "fire sale." (Paper 68, at 17).

Orteck terminated the Maryland Warehouse lease in the "third or fourth quarter of 2004." (*Orteck*, Paper 112, Attach. 5, Veen Dep., at 396:3-18). On October 28, 2004, Orteck

invoiced TransPacific for twelve months of rent at the Maryland Warehouse.   (*Id.* at 391:13-399:1; Attach. 28, Warehouse Rent Invoice).   The monthly rent for the warehouse was $11,500. Orteck billed TransPacific $7,500 per month for rent which in total was $90,000 for the year. (*Orteck*, Paper 112, Attach. 28, Warehouse Rent Invoice).   In reliance on Orteck's invoice, TransPacific issued a credit of $90,000 against the amount Orteck owed TransPacific.   (*Orteck*, Paper 112, Attach. 29). Orteck does not dispute that Orteck received a credit for an entire year's worth of rent even though it had sold all the tires in the Maryland Warehouse, had not paid TransPacific for the tires, and terminated the lease on the Maryland Warehouse short of a year in the third or fourth quarter of 2004. (*Orteck*, Paper 112, Attach. 5, Veen Dep., at 348:9-19).

On March 3, 2005, DeIorio and another TransPacific representative, Ronny Hoseada, met with Veen in Maryland. (*Orteck*, Paper 112, Attach. 5, Veen Dep., at 581:6-582:9).   At the meeting, the parties' representatives discussed Orteck's late payments and the need for Orteck to catch up on payments for its outstanding invoices.   Veen admitted that Orteck owed TransPacific money, but stated that the parties had not agreed on the amount of money owed.   (*Id.* at 596:21-598:1).

On April 15, 2005, TransPacific sent a letter to Orteck that detailed TransPacific's outstanding account balance. (*Orteck*, Paper 112, Attach. 29).  On May 10, 2005, Veen faxed to TransPacific the first page of the April 15th letter, which was marked with Veen's notes.  (*Orteck*, Paper 112, Attach. 5, Veen Dep., at 552:18-553:7; Attach. 40).  Veen requested additional information about one invoice and asked about "container numbers" for three consignment invoices.  (*Id.*).  On May 23, 2005, TransPacific sent a letter to Orteck, which provided the information Veen requested.  (*Orteck*, Paper 112, Attach. 41).

In June 2005, the parties continued their communications regarding Orteck's outstanding invoices.  TransPacific sent Orteck a letter on June 20, 2005 concerning Orteck's overdue account balance.  (*Orteck*, Paper 112, Attach. 42).  TransPacific rejected Veen's proposal of a payment plan and instead suggested that it would accept six monthly equal payments of $367,069.53 starting on July 1, 2005.  (*Id.*).  TransPacific informed Orteck that Orteck could resume placing orders if Orteck made those payments.  TransPacific alleges that Orteck never paid the outstanding bills.  (Paper 68, Attach. 1, at 9).

TransPacific filed a complaint against Orteck in the United States District Court for the Central District of California on August 17, 2005 (Paper 1) and filed an amended complaint on

January 20, 2006.  (Paper 12).  In January 2006, this case was transferred to the United States District Court for the District of Maryland.  After a period of discovery, TransPacific filed a motion for summary judgment on June 19, 2009.[3]  (Paper 62). TransPacific asks the court to enter judgment as a matter of law on counts 1, 2, and 11 of its amended complaint.

## II.  Orteck's Closed-Door Statute Argument

As a threshold matter, Orteck asks the court to dismiss TransPacific's suit because Md. Code Ann., Corps. & Assn's § 7-301 (the "Closed-Door Statute") allegedly bars TransPacific from bringing this suit in Maryland.  (Paper 67, at 6).

Orteck argues that the Closed-Door Statute bars unqualified foreign corporations from bringing suit in any Maryland court. (Paper 67, at 6).  Orteck asserts that TransPacific is an unqualified corporation because the charter authorizing it to do business in Maryland was forfeited on July 1, 2006.  (Paper 67, Attach. 3, ¶ 190).  Orteck contends that TransPacific's forfeiture of its charter "triggers the application of the Closed Door Statute and the dismissal of this case."  (Paper 67, at 7).

---

[3] Later, TransPacific filed an amended memorandum in support to its motion for summary judgment, in which citations to DSUMF have been corrected.  (Paper 68).

The "Closed-Door Statute" states:

> § 7-301.  Noncomplying corporation, maintenance of suit.
>
> If a foreign corporation is doing or has done any intrastate, interstate, or foreign business in the State without complying with the requirements of Subtitle 2 of this title, neither that corporation nor any person claiming under it may maintain a suit in any court of this State unless it shows to the satisfaction of the court that:
>
>> (1)  The foreign corporation or the person claiming under it has paid the penalty specified in §7-302 of this subtitle; and
>>
>> (2)  Either:
>>
>>> (i)  The foreign corporation or a foreign corporation successor to it has complied with the requirements of Subtitle 2 of this title; or
>>>
>>> (ii) The foreign corporation and any foreign corporation successor to it are no longer doing intrastate, interstate, or foreign business in this State.

Md. Code Ann., Corps. & Assn's § 7-301.

Orteck's request to dismiss TransPacific's suit under the statute after Orteck successfully moved to transfer the case to this court is disingenuous and Orteck's understanding of the Closed-Door Statute is misguided.

First, judicial estoppel weighs against Orteck's argument. Judicial estoppel "prevents a party who successfully pursued a

position in a prior legal proceeding from asserting a contrary position in a later proceeding." *Gordon v. Posner*, 142 Md.App. 399, 424 (2002), *cert. denied*, 369 Md. 180 (2002)(quotation marks omitted). TransPacific originally filed this action in a California court. On Orteck's motion, which TransPacific opposed, the case was transferred to the District of Maryland. Because Orteck first argued that the case should be transferred to Maryland, it may not later argue that the Closed-Door Statute prevents the court from hearing TransPacific's suit, which was not originally brought in Maryland.

Furthermore, the Closed-Door Statute would not apply to bar TransPacific's suit even if the case had originated in Maryland. "[U]nder §7-301, an unregistered or unqualified foreign corporation that engages in either interstate or foreign business activity in Maryland is barred from suing in the courts of this State only if the corporation also engages in localized business activity in Maryland such that it is 'doing business' here." *Yangming Marine Transport Corp. v. Revon Prods. U.S.A, Inc.*, 311 Md. 496, 505 (1988). "The party asserting that an unregistered or unqualified foreign corporation is 'doing business within the state' carries the burden of proof." *S.A.S. Personnel Consult., Inc. v. Pat-Pan, Inc.*, 286 Md. 335, 339 (1979). The Court of Appeals of Maryland has declined to grant

a motion to dismiss filed pursuant to the Closed-Door Statute when the plaintiff had ceased "doing business" in Maryland before its qualification lapsed. *See J.I. Case Credit Corp. v. Insley*, 293 Md. 483, 494 (1982). Orteck has not met its burden to prove that TransPacific is or was doing business in Maryland as an unregistered or unqualified corporation. TransPacific asserts that it has not done any business in Maryland since its charter was forfeited in 2006. (Paper 69, at 6; Attach. 1, Lawu Decl., ¶ 3). TransPacific only seeks to recover in this suit for business that was transacted before it forfeited its Maryland charter. Because TransPacific has not done any intrastate business in Maryland without complying with Section 2 as referenced in § 7-301, the Closed-Door Statute does not apply and TransPacific's suit will not be dismissed.

## III. Motion for Summary Judgment

### A.   Standard of Review

TransPacific has moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(f); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). In

other words, if there clearly exists factual issues "that
properly can be resolved only by a finder of fact because they
may reasonably be resolved in favor of either party," summary
judgment is inappropriate. *Anderson v. Liberty Lobby, Inc.*, 477
U.S. 242, 250 (1986); *JKC Holding Co. LLC v. Washington Sports
Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

When ruling on a motion for summary judgment, the court
must construe the facts alleged in the light most favorable to
the party opposing the motion. *See Scott v. Harris*, 127 S.Ct.
1769, 1774 (2007); *Emmett*, 532 F.3d at 297. A party who bears
the burden of proof on a particular claim must factually support
each element of his or her claim. *Celotex Corp.*, 477 U.S. at
323. As summarized by the Fourth Circuit:

> The party opposing a properly supported
> motion for summary judgment may not rest
> upon mere allegations or denials of his
> pleading, but "must come forward with
> specific facts showing that there is a
> genuine issue for trial." *Matsushita* [*Elec.
> Indus. Co. v. Zenith Radio Corp.*], 475 U.S.
> [574 (1986)] at 587, 106 S.Ct. 1348
> (internal quotation marks & emphasis
> omitted); *see Rivanna Trawlers Unlimited v.
> Thompson Trawlers, Inc.*, 840 F.2d 236, 240
> (4th Cir. 1988). "Mere unsupported
> speculation is not sufficient to defeat a
> summary judgment motion if the undisputed
> evidence indicates that the other party
> should win as a matter of law." *Francis v.
> Booz, Allen & Hamilton, Inc.*, 452 F.3d 299,
> 308 (4th Cir.2006); *see Ash v. UPS*, 800 F.2d
> 409, 411-12 (4th Cir. 1986) (per curiam)
> ("[U]nsupported speculation ... is not

14

> sufficient to defeat a summary judgment
> motion."). Nor can the nonmoving party
> "create a genuine issue of material fact
> through mere speculation or the building of
> one inference upon another." *Beale v. Hardy*,
> 769 F.2d 213, 214 (4th Cir.1985). "When the
> moving party has carried its burden under
> Rule 56(c), its opponent must do more than
> simply show that there is some metaphysical
> doubt as to the material facts." *Matsushita*,
> 475 U.S. at 586, 106 S.Ct. 1348 (footnote
> omitted).

*Emmett v. Johnson*, 532 at 297.

**B.   Analysis**

**1.   Breach of Contract (Counts 1 and 2)**

TransPacific argues that it should be granted summary judgment on its two breach of contract claims, count 1 (Breach of Contract re: Factory Direct Agreement) and count 2 (Breach of Contract re: California Warehouse Agreement), of its first amended complaint.   TransPacific alleges that Orteck has breached several contracts for its purchases of tires from TransPacific.   TransPacific contends that contracts existed between the parties because Orteck sent TransPacific written purchase orders for tires, which constituted offers for contracts, and TransPacific accepted those contracts by fulfilling Orteck's orders.   (Paper 68, Attach. 1, at 11-12). TransPacific alleges that Orteck breached those contracts by not remitting payment to TransPacific for the tires.   (*Id*. at 14-15).

TransPacific contends that the following amounts, reflected in invoices ordered by and delivered to Orteck, are due pursuant to the Factory Direct Agreement:

- Invoice No. 5199O / Order No. 5333 - $35,910.41
- Invoice No. 5190O / Order No. 5283 - $37,206.97
- Invoice No. 5191O / Order No. 5304 - $36,123.41
- Invoice No. 5193O / Order No. 5307 - $27,108.04
- Invoice No. 5196O / Order No. 5311 - $36,123.41
- Invoice No. 5197O / Order No. 5312 - $37,882.17
- Invoice No. 5201O / Order No. 6015 - $36,385.75
- Invoice No. 5202O / Order No. 6016 - $36,385.75
- Invoice No. 5203O / Order No. 6017 - $36,385.75
- Invoice No. 5204O / Order No. 6019 - $38,414.73
- Invoice No. 5208O / Order No. 6137 - $36,123.41
- Invoice No. 5209O / Order No. 6139 - $35,949.41

(Paper 68, at 14)(citations omitted).   The total TransPacific seeks for these invoices is $429,999.21, plus prejudgment interest.

Additionally, TransPacific argues that it is entitled to payment for an invoice in connection with the California Warehouse Agreement.   TransPacific states, "Orteck has not paid TransPacific $45,130.50 reflected in Invoice No. 100656Z, which was issued after TransPacific filled Orteck's Order No. W8007." (*Id.* at 15)(citation omitted).   TransPacific seeks $45,130.50 for this invoice, plus prejudgment interest.

Orteck counters that summary judgment should not be granted on TransPacific's breach of contract claims because disputes of material fact exist as to whether TransPacific delivered the

tires as claimed.   Orteck contends that TransPacific needs to present a "very specific paper trail" to show that TransPacific delivered the tires Orteck requested to Orteck's customers. (Paper 67, at 8).   Orteck asserts that in order to establish valid contracts for the "Factory Direct Agreement" invoices, TransPacific would have to produce the "documents of transfer (including a signed receipt)." (*Id.* at 9).   Orteck asserts that "[a]ppropriate documentary proof [for container sales or shipments claimed under the 'oral consignment agreement'] should consist of an Invoice, Packing List, Arrival Notice, Bills of Lading, and Proof of Delivery signed by Orteck's customer." (*Id.*).

Orteck argues that TransPacific has provided proper documentation to establish liability for only two invoices, 0051990 and 0051930, although Orteck asserts that "[t]hese admitted liabilities are subject to Orteck's claims for set off." (*Id.* at 10).   In contrast, Orteck states that TransPacific has not presented sufficient documentation for the rest of the invoices.   First, Orteck states that invoices 0051900, 052040, 052080, and 052090 have not been properly documented by TransPacific. (*Id.* at 11-12).   Second, Orteck asserts that invoices 051910, 051960, and 051970 were not properly documented.   Orteck alleges that the tires

17

corresponding to those invoices were sent to the Maryland Warehouse and that TransPacific attempts to count them twice for damages under its breach of contract and conversion claims. Third, Orteck asserts that TransPacific has produced "no paper trail of the shipment from the port to Orteck's customer and have no signed proof of delivery by Orteck's customers and have no proof of delivery to the Maryland Warehouse" for invoices 052010, 052020, and 052030.  (*Id.* at 14).  Finally, Orteck alleges that TransPacific has not provided any documents to support that a shipment was made for invoice 100656Z.  (*Id.* at 15).  Orteck concludes that TransPacific's summary judgment motion should be denied because of the alleged defects in TransPacific's documentation of all but two of the tire shipments related to its breach of contract claims.

Under Maryland Law, a contract for a sale of goods is governed by the Uniform Commercial Code ("UCC").  *See* Md. Code Ann., Com. Law §§ 2-101 *et seq.*  The UCC provides that a "contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract."  *Id.* at § 2-204(1).  "Unless otherwise unambiguously indicated by the language or circumstances," "[a]n offer to make a contract shall

18

be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances." *Id.* at § 2-206(1)(a).

The UCC does not define the term "offer." *Maryland Supreme Corp. v. Blake Co.*, 279 Md. 531, 538-39 (1977).  Maryland courts "look to the common law and the law merchant" to determine whether an offer has been made. *Id.* at 539.  "An offer must be definite and certain." *Id.* "To be capable of being converted into a contract of sale by an acceptance, it must be made under circumstances evidencing an express or implied intention that its acceptance shall constitute a binding contract." *Id.* "[I]n its final determination, the question of whether an offer was made seems to be one dependent on the intention of the parties, and, being such, it depends on the facts and circumstances of the particular case." *Id.* at 540.

Courts have typically regarded a written purchase order as an offer to buy. *See USEMCO, Inc. v. Marbro Co.*, 60 Md.App. 351, 362 (1984)(finding that a purchase order "constitute[d] an offer to buy"); *Audio Visual Assocs., Inc. v. Sharp Elecs. Corp.*, 210 F.3d 254, 259 (4th Cir. 2000)(noting in a case interpreting Maryland contract law, "Typically, a seller's price quotation is an invitation for an offer, and the offer usually takes the form of a purchase order, providing product choice, quantity, price, and terms of delivery.").

19

When an offer is made by one party, a contract may only be formed if acceptance of the offer is expressed by another party. *Blake*, 279 Md. At 541 ("The mutual assent which is the essential feature of every contract is crystallized when there is a knowing and sufficient acceptance to a certain and definite offer."). The UCC provides that the seller can accept such an offer in any of several ways, often determined by custom and practice. *See* Md. Code Ann., Com. Law §§ 2-204(1), 2-206(1), 2-208. Unless otherwise indicated by the offeror, "[a]n order or other offer to buy goods for prompt or current shipment shall be construed as inviting acceptance either by a prompt promise to ship or by the prompt or current shipment of conforming or nonconforming goods. . . ." *Id.* at § 2-206(1)(b).

Once a contract has been formed, "[t]he obligation of the seller is to transfer and deliver and that of the buyer is to accept and pay in accordance with the contract." Md. Code Ann., Com. Law § 2-301. A buyer's failure to pay for goods is a material breach of contract that entitles the seller to damages. *Id.* at §§ 2-607, 2-709. UCC Section 2-709(1)(a) provides that "[w]hen the buyer fails to pay the price as it becomes due the seller may recover . . . the price . . . [o]f goods accepted." *Id.* Thus, a seller is entitled to recover damages for the

purchase price of goods when a buyer breaches a contract for the sale of goods by failing to pay the purchase price.

In addition to damages, a seller may also recover prejudgment interest when a buyer breaches a contract for a sale of goods by failing to pay the invoice price for goods ordered and delivered. "Pre-judgment interest is allowable as a matter of right when 'the obligation to pay and the amount due had become certain, definite, and liquidated by a specific date prior to judgment so that the effect of the debtor's withholding payment was to deprive the creditor of the use of a fixed amount as of a known date.'" *Buxton v. Buxton*, 363 Md. 634, 656 (2001)(quoting *First Virginia Bank v. Settles*, 322 Md. 555, 564 (1991)). The statutory rate for prejudgment interest is six percent per annum. Md. Const. art. III, § 57.

Here, Orteck entered into several contracts with TransPacific. For each contract, Orteck sent a written purchase order for tires to TransPacific. Orteck's purchase order constituted an offer to enter into a contract. In response, TransPacific accepted Orteck's offer for each contract by shipping the tires described in Orteck's purchase order and by issuing an invoice to Orteck. TransPacific arranged for the delivery of tires pursuant to Orteck's instructions for each of the orders. To support its breach of contract claims,

TransPacific has provided as evidence documents created by Orteck indicating that Orteck placed the orders, TransPacific invoices, and bills of lading showing that the tires were shipped from either the factory in China or TransPacific's California warehouse.   While Orteck disputes the type of documents TransPacific needs to produce to meet its burden for summary judgment, Orteck does not dispute that the tires for each invoice were delivered. Orteck has not produced any evidence to refute the inference that the tires underlying any of the invoices at issue were delivered.   Furthermore, Orteck has not presented any evidence to show that Orteck paid TransPacific the amounts specified in the invoices.[4]

Accordingly, Orteck has not raised a genuine issue of material fact and will be liable to TransPacific for the invoice price of the tires in following invoices, plus prejudgment interest:

---

[4]   Orteck contends that invoices 51910, 51960, and 51970 were "double counted by TransPacific as proof of damages for conversion." (Paper 67, at 12).   The container numbers holding these shipments (UCMU8952949, ECMU9022245, and ECMU9265353), however, do not appear on TransPacific's list of consignment containers that were shipped to Maryland, which is the list used as the basis for TransPacific's conversion claim.   (*Compare Orteck*, Paper 112, Attach. 21, DeIorio Decl., Ex. F, at TP001973 *with Orteck*, Paper 112, Attach. 21, DeIorio Decl., Ex. O, at ORTECK 001279; Ex. R, at ORTECK 001283; Ex. T, at ORTECK 001288).   Thus, Orteck's assertion of double counting is without evidentiary support.

- Invoice No. 5199O / Order No. 5333 - $35,910.41
- Invoice No. 5190O / Order No. 5283 - $37,206.97
- Invoice No. 5191O / Order No. 5304 - $36,123.41
- Invoice No. 5193O / Order No. 5307 - $27,108.04
- Invoice No. 5196O / Order No. 5311 - $36,123.41
- Invoice No. 5197O / Order No. 5312 - $37,882.17
- Invoice No. 5201O / Order No. 6015 - $36,385.75
- Invoice No. 5202O / Order No. 6016 - $36,385.75
- Invoice No. 5203O / Order No. 6017 - $36,385.75
- Invoice No. 5204O / Order No. 6019 - $38,414.73
- Invoice No. 5208O / Order No. 6137 - $36,123.41
- Invoice No. 5209O / Order No. 6139 - $35,949.41

  and

- Invoice No. 100656Z / Order No. W8007 - $45,130.50

Accordingly, judgment will be entered in favor of TransPacific in the amount of $475,129.71 in damages plus prejudgment interest of 6% accruing between 30 days after the invoice date and the date of final judgment.

**2.   Conversion (Count 11)**

TransPacific argues that it should be granted summary judgment on its conversion claim, count 11 of its first amended complaint.  TransPacific alleges that Orteck sold all of the tires owned by TransPacific that were stored at the Maryland Warehouse, but did not pay TransPacific for those tires.  (Paper 68, Attach. 1, at 17).  TransPacific argues that Orteck is liable for conversion as a matter of law because: 1) Orteck was a consignee who failed to return or pay for consigned goods; and

23

2) even if the parties' alleged Consignment Agreement was invalid, Orteck intentionally exerted unlawful control over TransPacific's property in denial of TransPacific's right to the property. (*Id.* at 16-18). As proof of the quantity of the tires that were in the warehouse, TransPacific offers invoices generated after physical audits of the warehouse (*Orteck*, Paper 112, Attach 22, Ex. D, at TP002007), a list of all the containers shipped to the Maryland Warehouse on consignment (*Id.*, Ex. F, at TP001973), and the bills of lading showing all of the containers that were shipped from China. (*Id.*, Ex. CC).

TransPacific seeks to be awarded the fair market value of the tires shipped by TransPacific to the Maryland Warehouse for six invoices:

- Invoice No. 300002O – $1,388.91
- Invoice No. 300003O – $70,929.97
- Invoice No. 300004O – $120,272.11
- Invoice No. 300005O – $548,198.61
- Invoice No. 300011O – $547,634.81
- Invoice No. INVDC00000707 – $538,776.33

(Paper 68, at 20).

TransPacific notes:

> Measured by invoice prices, the total fair market value of the converted tires is actually $1,827,150.74. In closing out its relationship with Orteck, however, TransPacific applied several credits, including the generous credit for the warehouse rent . . . . Accounting for these credits results in a reduction of the amount

24

> of damages that TransPacific seeks for
> conversion to $1,725,231 . . . .

(Paper 68, at 20, n.1)(citation omitted).

Thus, TransPacific seeks summary judgment on its conversion claim and an award of $1,725,231 in damages, plus prejudgment interest. TransPacific's amended complaint also seeks punitive damages on TransPacific's conversion claim.

Orteck responds that TransPacific is not entitled to summary judgment on its conversion claim because Orteck properly rejected the tires and disposed of them in a "commercial, reasonable manner" under the UCC. (Paper 67, at 16). Citing Md. Code Ann., Com. Law § 2-601, the "Perfect Tender" rule, Orteck contends that it rightfully rejected TransPacific's shipments of "unwanted or surplus" tires to the Maryland Warehouse. (*Id.* at 19). Section 2-601(a) states, ". . . if the goods or the tender of delivery fail in any respect to conform to the contract, the buyer may (a) Reject the whole . . . ." *Id.* Orteck asserts that it rightfully rejected TransPacific's shipments of "unwanted or surplus" tires to the Maryland Warehouse because the tires failed to conform to the contract between the parties and because Orteck notified TransPacific about the rejection of the tires a reasonable time after TransPacific delivered them. (Paper 67, at 18-19). Additionally, Orteck contends that its sale of the tires does

25

not amount to conversion because Orteck held the tires for a time sufficient for TransPacific to remove them, and TransPacific instead abandoned them. (*Id.* at 20-21, 23). Finally, Orteck disputes TransPacific's calculation of damages and asserts that the amount Orteck realized from selling the tires is the "fair market value of the tires." (*Id.* at 26-29). Orteck concludes that in addition to denying TransPacific's motion for summary judgment on its conversion claim, the court should award Orteck "its rightful relief" of a ten percent commission on the tires it sold from the Maryland Warehouse in addition to expenses and other costs. (*Id.* at 23).

"Conversion is an intentional tort, consisting of two elements, a physical act combined with a certain state of mind." *Darcars Motors of Silver Springs, Inc. v* Borzym, 379 Md. 249, 261 (2004). "The physical act can be summarized as "'any distinct act of ownership or dominion exerted by one person over the personal property of another in denial of his right or inconsistent with it.'" *Id.* (quoting *Allied Investment Corp. v. Jasen,* 354 Md. 547, 560 (1999). In addition to the physical act of exerting unlawful control,

> . . . there is an intent element to the tort
> of conversion, and a wide range of different
> states of mind qualify. At a minimum, a
> defendant liable of conversion must have "an
> intent to exercise a dominion or control
> over the goods which is in fact inconsistent

26

with the plaintiff's rights." *Keys v.
Chrysler Credit Corp.,* 303 Md. 397, 414, 494
A.2d 200, 208 (1985). The defendant may
have the requisite intent even though he or
she acted in good faith and lacked any
consciousness of wrongdoing, as long as
there was an intent to exert control over
the property.

*Darcars*, 379 Md. at 262. A defendant's level of intent may also

rise to the level of "actual malice," or consciousness of the

wrongdoing, in which case the defendant's conduct may justify a

jury's imposition of punitive damages. *Id.* at 263-64.

Conversion may occur in a variety of circumstances. "For

example, '[a] purchaser of stolen goods or an auctioneer who

sells them in the utmost good faith becomes a converter, since

the auctioneer's acts are an interference with the control of

the property.'" *Id.* 262-63. Additionally, a consignee who

fails to return or pay for consigned goods may be held liable

for conversion. *See, e.g. Bacon & Assocs, Inc. v. Rolly Tasker

Sails (Thailand) Co.,* 154 Md.App. 617, 632 (2004).

Here, Orteck is liable for the tort of conversion.

TransPacific made several shipments of tires to the Maryland

Warehouse.[5] (*Orteck*, Paper 112, Attach 22, Ex. D, at TP002007;

Ex. F, at TP001973; Ex. CC). Orteck admitted through Veen's

_____

[5] Orteck's assertion that TransPacific has not included the
proper documentation to establish that the tires were delivered
is incorrect. To the contrary, Orteck has not presented any
evidence to refute the evidence that the tires were delivered.

testimony that, in October and November of 2004, Orteck sold the tires stored by TransPacific at the Maryland Warehouse in a "fire sale." (*Orteck*, Paper 112, Attach. 5, Veen Dep., at 356:14-358:6, 538:14-20). Orteck admitted that it had sold or otherwise disposed of tires TransPacific stored in the Maryland Warehouse by March 3, 2005. (*Orteck*, Paper 112, Attach 44, ¶ 21). Orteck's suggestion that TransPacific gave Orteck permission to hold the "fire sale" is without evidentiary support. Orteck did not pay TransPacific for the tires it sold in the "fire sale." (*Orteck*, Paper 112, Attach. 5, Veen Dep., at 357:7-358:6). Orteck's sale of TransPacific's tires, without subsequent payment for those tires, is a distinct act of ownership or dominion exerted over TransPacific's property in denial of TransPacific's right to the tires. While it is an issue for the jury whether Orteck acted with "actual malice" when it held the "fire sale" and later did not pay for the tires, Orteck at least acted with good faith intent to exert control over TransPacific's property. Thus, Orteck has committed the tort of conversion.

Orteck's arguments regarding the "Perfect Tender" rule are unpersuasive. To repeat, the rule states, ". . . if the goods or the tender of delivery fail in any respect to conform to the contract, the buyer may (a) Reject the whole. . . ." Md. Code

28

Ann., Com. Law § 2-601(a).  TransPacific does not argue that it delivered the tires at issue for its conversion claim pursuant to a contract.  While Orteck contends that TransPacific should have sent "an appropriate mix of Steer Tires to service GCR, not the unmarketable and space consuming allotment of drive tires dumped upon Orteck by TransPacific," Orteck has not presented any evidence of an agreement between the parties that required TransPacific only to ship an "appropriate mix."  (Paper 67, at 18; Paper 68, at 16-17).  Orteck admitted through Veen's testimony that the parties did not have a finalized agreement, written or otherwise, that prohibited TransPacific from shipping tires to the warehouse even if Orteck had not ordered them. (*Orteck*, Paper 112, Attach. 5, Veen Dep., at 331:9-332:13). Additionally, a rejection "is ineffective unless the buyer seasonably notifies the seller."  Md. Code Ann., Com. Law § 2-602(1).  Although Orteck contends that "Orteck rightfully rejected the non-conforming tires that were shipped to the Maryland warehouse because it promptly notified TransPacific that they were not conforming . . . .," it has not presented evidence of its rejection of any shipment.  (Paper 67, Attach 15, Veen Decl., ¶ 93).  Therefore, the "Perfect Tender" rule does not apply in this case to shield Orteck from liability for conversion.

"The measure of damages in an action for conversion of personal property is the fair market value of the property at the time of conversion, with legal interest thereon to the date of the verdict." *Keys v. Chrysler Credit Corp.,* 303 Md. 397, 415 (1985).

TransPacific claims that the following invoices, reflecting wholesale prices, establish the fair market value of the tires shipped by TransPacific to the Maryland Warehouse before Orteck converted and sold the tires:

- Invoice No. 3000020 – $1,388.91
- Invoice No. 3000030 – $70,929.97
- Invoice No. 3000040 – $120,272.11
- Invoice No. 3000050 – $548,198.61
- Invoice No. 3000110 – $547,634.81
- Invoice No. INVDC00000707 – $538,776.33

(Paper 68, at 20)(citations omitted). The total amount TransPacific seeks for these invoices is $1,725,231 plus prejudgment interest.

Orteck asserts that there is a genuine issue of material fact as to the fair market value for the tires because its calculation of the value of the tires sold at the "fire sale" is $547,089. (Paper 67, Attach 15, Veen Decl., ¶ 41). The evidence Orteck has presented as to the value of the tires, however, is inconsistent and therefore does not raise a genuine issue of fact regarding the value of the tires. Orteck did not

attempt to value the tires sold at the "fire sale" until Veen's declaration was submitted with Orteck's opposition to TransPacific's motion for summary judgment.   In fact, Veen testified on an earlier date that Orteck "could not arrive at an amount" for the tires without TransPacific's input, but that the amount was "much less than" TransPacific claimed.   (*Orteck*, Paper 112, Attach. 5, Veen Dep., at 597:8-601:12).   Veen stated that "fire sale" meant a "deep discount".   (*Id.* at 582:9).   When asked specifically show much Orteck realized from the "fire sale," Veen testified, "I don't recall."   (*Id.* at 538:21-539:2).   Veen's declaration, which values the tires at $547,089, contradicts his own prior testimony.   "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact."   *Barwick v. Celotex Corporation*, 736 F.2d 946, 960 (4th Cir. 1984)(quoting *Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2[d] Cir. 1969)).   Accordingly, "[a] genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the . . . testimony is correct."   *Id.*   Therefore, Orteck's valuation of the tires, as stated in Veen's declaration, is not sufficient to

raise a genuine factual dispute as to the fair market valuation of the converted tires.

Accordingly, judgment will be entered in favor of TransPacific in the amount of $1,725,231 in damages plus prejudgment interest of 6% accruing between March 3, 2005 and the date of final judgment.[6]

## IV.  Conclusion

For the foregoing reasons, Plaintiff's motion for summary judgment will be granted as to counts 1, 2, and 11 of Plaintiff's amended complaint.    Plaintiff will be awarded damages in the amount of $475,129.71 plus prejudgment interest for its breach of contract claims and $1,725,231 plus prejudgment interest for its conversion claim.    A separate Order will follow.


                                        /s/
                              _____
                              DEBORAH K. CHASANOW
                              United States District Judge

_____

[6] TransPacific also seeks punitive damages on its conversion claim, but correctly notes that "entitlement to punitive damages and the amount of punitive damages is an issue to be determined by a jury." (Paper 68, at 19, n.9).